NORTH TEXAS CONSTRUCTION COM-
PANY, Appellant,

v.

UNITED STATES FIRE INSURANCE
COMPANY, Appellee.

No. 5162.

Court of Civil Appeals of Texas,
Waco.

Aug. 31, 1972.

Kennedy & Minshew, Sherman, for appellant.

Henderson, Bryant & Wolfe, Sherman, for appellee.

HALL, Justice.

North Texas Construction Company brought this action against United States Fire Insurance Company on a builder's risk policy issued by defendant to plaintiff, for damage to galvanized sheet metal. The policy insured against "all risks of physical loss or damage from any external cause" except as expressly excluded by its terms. The exclusions include "loss or damage to property in the open caused by rain;" or "by deterioration"; or "by rust". Defendant affirmatively pleaded these provisions.

After a hearing without a jury, the trial court concluded that plaintiff's loss fell within the exclusionary terms of the policy and rendered a take nothing judgment. Hence, this appeal. We affirm.

The court filed express findings of fact that the damage to the sheet metal was caused (1) "by rain on March 7, 1969, while the sheet metal was in the open"; and (2) "by deterioration"; and (3) "by rust". Plaintiff contends there is no evidence to support these findings.

■ A proper testing of the evidence to determine whether it is legally sufficient to support the challenged findings requires that we consider only the evidence and all reasonable inferences therefrom that favor the findings and reject all contrary evidence and inferences. Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60, 61 (1953). Briefly reviewed in this light, the record shows the following facts.

■ Plaintiff was engaged in the construction of a hangar. Don T. Wallace, plaintiff's vice-president, was in charge of the job. The roof, sides and doors of the hangar were to be covered with sheets of galvanized metal. The sheets were made of 26-gauge steel laminated with zinc galvanizing on both sides to protect the steel from the elements.

About 10 days prior to Friday, May 7, 1969, the sheeting was delivered by its manufacturer to plaintiff's job-site. When delivered the sheets were, according to Wallace, "wrapped in polyethylene then banded with band metal in a wood frame and then wrapped again in a cardboard container, which is also paraffined, and then probably also banded and put on skids again with cover sheets to protect it. They package these things well and you have to go to quite a bit of work to get to the sheets." On delivery, the packaged sheets were not placed inside or under any building or other structure, but were stacked in a sloping fashion on some boards that were placed on the ground in the open.

Near the end of the workday on Friday, May 7, 1969, plaintiff's employees removed the sheets from the original packages to check them for size and number. The workmen replaced the sheets onto the blocks of wood; and, in Wallace's words, "we covered these back up with polyethylene that we brought to the job-site specifically for this purpose, and covered the whole package * * * and wrapped it all up and weighted it down on the stacks." That night, during a wind and rainstorm, the covering was blown from the sheets and water was blown between some of the sheets. Wallace learned of this the next morning and went to the site, but because of mud he didn't go to the sheets. However, he had learned, and could see, that the sheets had been recovered. The following Monday, he separated for drying purposes those sheets that appeared to be wet, and began installation of the sheets onto the hangar.

About a week after installation began, some discoloration was noted on some of the sheets that were in place on the hangar. Wallace recognized it as "white rust." He testified that when water gets between stacked sheets of galvanized steel and no oxygen is present, a chemical reaction known in the structural steel business as "electrolysis" occurs; that the electrolysis causes the white rust; that "when you get the so-called white rust it just flakes and

deteriorates the zinc coating on this metal to the extent that then you get the red rust when the zinc is gone"; that the white rust "is bad within itself, but the ultimate damage is done by the red rust, because the red rust is what eats through the steel"; that "the white rust only eats through the galvanizing, and then lets the red rust deteriorate the steel underneath it, which is the structural portion of the sheet"; that "when water gets into a stack of these sheets where no air is circulating they are going to deteriorate"; that the sheets "deteriorated to the point of ruination"; and that "the red rust was the culmination or actual damage that finally became apparent".

We hold that the evidence is legally sufficient to support the findings in question. Any one of the findings supports the judgment.

Plaintiff's points and contentions are overruled. The judgment is affirmed.